## FEDERAL FORWARDING CO. et al. v. LANASA.

Circuit Court of Appeals, Fourth Circuit.
April 12, 1929.

No. 2821.

J. Stuart Galloway and Washington Bowie, both of Baltimore, Md., for appellants.

Robert W. Williams, of Baltimore, Md. (Bigham, Englar, Jones & Houston, of New York City, Janney, Ober, Slingluff & Wil-

liams, of Baltimore, Md., and F. Herbert Prem, of New York City, on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and McDOWELL, District Judge.

PARKER, Circuit Judge. This is an appeal from a decree in favor of the libelant, who was the charterer of the steamship Fort Gaines, awarding damages against her owner for breach of the warranty of seaworthiness contained in the charter party. The vessel was chartered on August 27, 1925, for a period of 11 months, and was used by the charterer in the fruit trade between Jamaica and Baltimore. Her officers and crew were employed and paid by the owner, who agreed to maintain her in a seaworthy condition throughout the charter period. The charter party warranted that she was "tight, staunch, strong and in every way fitted for the service, * * * with full complement of officers, seamen, engineers, firemen, etc.," and the excepting clause was as follows: "The act of God, the king's enemies, fire, restraints of princes, rulers and people and all other dangers and accidents of the seas, rivers, machinery, boilers and steam navigation throughout this charter party always excepted."

On the evening of March 31, 1926, after the vessel had completed loading at Port Antonio, Jamaica, and was preparing to sail for Baltimore, it was discovered that the impeller shaft of her centrifugal pump was broken. In fitting another shaft, so that she might proceed on her voyage, a day was lost in the harbor of Port Antonio, and this delay caused the damage to her cargo of bananas of which libelant complains. The evidence is that the break occurred without apparent cause, being due to a latent defect or weakness in the metal of the impeller shaft, not discovered when the vessel was surveyed about two months before. There was no evidence of any external cause which could have resulted in the breaking of the shaft, either at Port Antonio or after the vessel had left Baltimore on the voyage in which the delay occurred.

■ We think that it is perfectly clear that the charter party did not constitute a demise of the vessel, but a contract of affreightment. The owner did not surrender control of her to the charterer, but through the officers and crew retained entire dominion over her. The charterer thus received merely the right to the services of the vessel, not the right of control over the vessel herself. The rule applicable in such a case is well stated in 24 R. C. L. 1095, as follows: "The terms of greatest significance in the determination as to whether a given charter amounts to a demise or is merely a contract of affreightment are those which relate to the master and crew. If they are appointed and paid by the owner, and are subject to his orders, the charter will ordinarily be construed as an affreightment contract, on the theory that through his master and crew the owner retains possession and control of the ship, even though the directions on which the ship shall proceed are given by the charterer." See, also, New Orleans-Belize Royal Mail & Central American S. S. Co. v. U. S., 239 U. S. 202, 206, 36 S. Ct. 76, 60 L. Ed. 227; Shaw v. U. S., 93 U. S. 235, 23 L. Ed. 880; Multnomah County v. Willamette Towing Co., 49 Or. 204, 89 P. 389; and note in 5 Ann. Cas. at page 623, and cases cited.

■ And we think it equally clear that, as the vessel was operating under a time charter, which contemplated a number of voyages, the warranty of seaworthiness must be construed as requiring that the vessel be seaworthy at the inception of each and every voyage. Luckenbach v. McCahan Sugar Co., 248 U. S. 139, 150, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522. And, as she was engaged in the transportation of highly perishable freight, being seaworthy meant that there be nothing in her condition or equipment which would cause delay, once the perishable cargo was loaded; for the test of seaworthiness is the fitness of the vessel to carry the cargo which she has undertaken to transport. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; Bank Line v. Porter (C. C. A. 4th) 25 F.(2d) 843, 844; The Fort Morgan (C. C. A. 4th) 284 F. 1.

■ The evidence establishes that under this test the Fort Gaines was not seaworthy for the service in which she was engaged. The weakness or defect of the impeller shaft, which was likely to cause, and did cause, it to break, was a defect in the machinery of the vessel, which was likely to result and did result in delay in the voyage, with consequent damage to the highly perishable cargo of bananas. And the fact that it was a latent and not a patent defect makes no difference, for the obligation of the owner under the warranty of seaworthiness is absolute. The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181. In The Caledonia, the Supreme Court, speaking

through Chief Justice Fuller, quotes with approval the rule as stated by Chancellor Kent as follows:

" 'The ship must be fit and competent for the sort of cargo and the particular service in which she is engaged. If there should be a latent defect in the vessel, unknown to the owner and not discoverable upon examination, yet the better opinion is that the owner must answer for the damage caused by the defect. It is an implied warranty in the contract that the ship be sound for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted perils.' 3 Kent, 205."

Chief Justice Fuller also quotes with approval in that case the statement of the rule by Judge Brown in The Rover (D. C.) 33 F. 515, 516, as follows:

"This warranty extends to latent defects not discoverable by prior examination. Either the ship or the freighter must bear such risks; under the warranty of seaworthiness, the law places this risk upon the ship and her owners."

In the case of The Caledonia there was a delay of a cattle ship due to the breaking of her propeller shaft at sea. The cause of the breaking was that the shaft had been weakened by the vessel's having met with extraordinarily heavy seas on prior voyages. The court held that the loss was not within the exception of the bill of lading as to defects in machinery, on the ground that this exception did not apply to defects existing at the inception of the voyage. It was also held that the warranty as to seaworthiness covered latent defects. On this point the court said:

"The proposition that the warranty of seaworthiness exists by implication in all contracts for sea carriage, we do not understand to be denied; but it is insisted that the warranty is not absolute, and does not cover latent defects not ordinarily susceptible of detection. If this were so, the obligation resting on the shipowner would be, not that the ship should be fit, but, that he had honestly done his best to make her so. We cannot concur in this view. In our opinion, the shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects. The necessity of this conclusion is made obvious when we consider the settled

rule in respect of insurance, for it is clear that the undertaking as to seaworthiness of the shipowner to the shipper is coextensive with that of the shipper to his insurer."

In The Carib Prince, supra, injury occurred to a part of a cargo as the result of the giving way of rivets due to latent defects which arose during the construction of the vessel. The giving way of the rivets allowed water from the peak tank to escape into the cargo space. The Supreme Court held that the warranty of seaworthiness applied as against latent defects existing at the commencement of the voyage; that an injury due to such defects was not within the protection of the excepting clause; and that the Harter Act did not operate to exempt the owner, who had used due diligence, from liability in such case, as the unseaworthiness, which was the cause of the damage, could not be considered a fault or error in navigation, or in the management of the vessel, or as any of the other causes from liability for which the owner is exempted by section 3 of the Harter Act (46 USCA § 192). In that case there was express language in the bill of lading excepting damage caused by latent defects of the hull, machinery, etc.; but it was held that even this did not take the case out of the rule laid down in The Caledonia. The court, speaking through Mr. Justice White, said:

"The fact that the exempting clause in the present case refers to latent defects, whilst that passed on in The Caledonia embraced defects generally, does not take this case out of the control of the general rule laid down in The Caledonia. The decision in The Caledonia was based, not on the particular character of the defects there referred to, but on the general ground that, unless there were express words to the contrary, the language of the exempting clause would not be held to apply to defects, whether patent or latent, existing when the voyage was commenced. In other words, that where the owner desires the exemption to cover a condition of unseaworthiness existing at the commencement of the voyage, he must unequivocally so contract."

We think that this case falls squarely within the rule laid down in The Caledonia and The Carib Prince. Even if we assume, as contended by respondent, and as we think is correct, that the voyage commenced at Baltimore (The Buckingham [D. C.] 129 F. 975; Carver's Carriage by Sea, § 148), nevertheless the unseaworthy condition due to the weak and defective impeller shaft evidently existed at that time. It is not shown

that there was heavy weather upon the voyage to Jamaica, or that there was other external cause which could account for the weakening of the shaft; and consequently we must conclude that the latent defect existed when the voyage began. And this fact distinguishes the case at bar from The Curlew (C. C. A. 4th) 55 F. 1003. In that case Judge Hughes pointed out that there was no flaw in the ring which broke that could be detected in examining its broken pieces after the accident, and that the inference was reasonable that its breaking was due to some cause exterior to itself, and was therefore one of those accidents of the sea and of the machinery of the ship, from the consequences of which the ship was exempted by the charter party. In this case we have carefully considered whether the breaking of the impeller shaft might not be considered an accident of machinery within the meaning of the excepting clause, but we do not think so. There is no explanation of its breaking, except that found in the evidence of the captain and the chief engineer, both of whom testified that in their opinion it was due to a hidden flaw in the metal, a latent defect.

The respondent seeks to draw a distinction between the absolute liability of a carrier under a bill of lading for the seaworthiness of the vessel and that of the owner under a time charter; but the distinction attempted to be drawn is of no importance in this case. The owner here expressly warranted the seaworthiness of the vessel; and, as we have seen, this means its seaworthiness at the commencement of each and every voyage. The absolute liability of the owner under such a warranty is well stated in Luckenbach v. McCahan Sugar Co., supra, 248 U. S. 139, 150, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522, where the question under consideration was the liability of the owner under the charter, not that of the charterer to shippers. Mr. Justice Brandeis, speaking for the court, said:

"The charter of the vessel states clearly that, the vessel 'being, on her delivery, tight, staunch (and) strong,' the owners will 'maintain her in a thoroughly efficient state in hull and machinery for and during the service'— *not pay the expense* of maintaining her. This duty to maintain the vessel in an efficient state is imposed by the contract, because a time charter, like a charter for a single voyage, is not a demise of the ship. In both, the charterer is without control over her repair and maintenance. In operations under each the charterer becomes liable to shippers without limitation for losses due to unsea-

worthiness discoverable by the exercise of due diligence on the part of the owners; and in each case he requires for his protection a warranty, without limitation, of seaworthiness at the commencement of every voyage."

The point is made by respondent that libelant has no interest in the case, because he has been paid by the insurers of the cargo for the loss which he sustained, and that therefore the libel should be dismissed. Apart from the fact that the underwriters have been made parties to the suit, the point is without merit; for the equities existing between libelant and the underwriters are no concern of respondent. The Propeller Monticello v. Mollison, 17 How. 152, 15 L. Ed. 68.

For the reasons stated, the decree in favor of libelant is clearly correct, and same is accordingly affirmed.

Affirmed.