## THE NICHIYO MARU.

### TOYO KISEN KABUSHIKI KAISHA et al. v. WELLMAN et al.

### THE TOHSEI MARU.

### YAMASHITA S. S. CO., Limited, v. SAME.

### Nos. 4104–4106.

Circuit Court of Appeals, Fourth Circuit.
April 6, 1937.

George Forbes, of Baltimore, Md., and George C. Sprague, of New York City (Henry L. Wortche, of Baltimore, Md., on the brief), for appellants.

George W. P. Whip, of Baltimore, Md. (Lord & Whip, of Baltimore, Md., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and WATKINS, District Judge.

PARKER, Circuit Judge.

These are appeals in admiralty from decrees in three cases which by consent were heard together in the court below. In each case claim was made for damages to cargo shipments of fish meal made from ports in Japan to Baltimore. Libels were filed by the consignee, William E. Wellman, a broker, in behalf of himself and

all other persons interested in the shipments, against the vessels Soyo Maru, Nichiyo Maru, and Tohsei Maru. The Standard Wholesale Phosphate & Acid Works, Inc., the corporation which had purchased the cargoes of fish meal from Wellman, and which had given guaranty to a bank that he would pay for same and thereby enabled him to obtain the letters of credit upon which the shipments were made, and which had subsequently paid him for the shipments, was allowed to intervene in the proceedings.

Liability on the part of the three vessels was asserted on the ground of negligence in the stowage and ventilation of the cargoes and deviation in the voyages. The court below found against libelants on the issue as to deviation, but held that there was damage to the cargoes resulting from negligent stowage and lack of ventilation, and rendered decree against the Soyo for $3,102.75, against the Nichiyo for $2,240, and against the Tohsei for $1,093.25. 14 F.Supp. 727. Two questions are raised by the appeal: (1) Whether the damage to the fish meal resulted from the negligence of the vessels or is to be attributed to the inherent nature of the meal itself; and (2) whether the libels may be maintained in view of the fact that Wellman had been paid in full for the cargoes before the libels were filed and the Standard Wholesale Phosphate & Acid Works had not been brought in as a party until after the lapse of more than a year and after its right to sue had been barred by express provision of the bills of lading.

The facts are fully and correctly stated in the opinion of the court below and what is there so well said need not be repeated. For an understanding of the questions involved in the appeal, however, a brief statement of the salient facts may be helpful. It appears that the fish meal was delivered to the vessels in Japan in good order and condition for shipment to Wellman in Baltimore; that it was stowed on the vessels in the holds and 'tweendecks and, after voyages lasting about sixty days in the case of the Soyo and forty days in the case of the other two vessels, was delivered at Baltimore, where a large part of the cargoes stowed in the holds of the vessels was found to be damaged as the result of heating; that fish meal is an oily substance which is subject to heating and to spontaneous combustion unless properly ventilated and which, because of this propensity, requires that special care be exercised in storing it; that, although no standards had been developed at the time of these shipments for the proper stowage of cargoes of fish meal for voyages of this length, the importance of ventilation was recognized and the danger of stowing too large a quantity in a limited space with inadequate ventilation was well understood; that, notwithstanding this knowledge, the appellants stowed large quantities of the fish meal in the holds, piling it up to within a few feet of the decks, so that piles twenty-five feet or more in height were stacked up, almost completely filling the space available; and that it was the meal thus stowed in the holds that arrived in damaged condition, while that which had been stowed in the 'tweendecks, where the ventilation was better and the quantity stowed not so great, arrived in good condition, except as to a negligible quantity on only one of the vessels. The findings of the judge below with respect to the negligent stowage and the defense of inherent vice in the cargo are as follows (14 F. Supp. 727, 733):

"7. I find the cause of the damage was the stowage of very large masses of fish meal in the lower holds with entirely inadequate provision for the ventilation thereof. In the cases of the Soyo Maru the only provision for ventilation was to leave an air space of about a foot on the four sides of the tiers of bags with some effort to provide small air spaces between some of the bags which, as already stated, was largely nullified by the settlement of the bags during the voyage. In the Nichiyo Maru and the Tohsei a net-work of rice ventilators was used to afford some interior ventilation to parts of the whole mass. And on the Tohsei wind sails were used on deck at times to increase the flow of air through ventilators to the lower holds. But these extra precautions for ventilation in the cases of the Nichiyo and the Tohsei were entirely inadequate to provide sufficient ventilation for the mass of bags stowed in the lower holds.

"8. The respondents contend that all facts considered, the damage to the fish meal should be attributed to its inherent nature and characteristics or, in other words, that the fish meal that was damaged was not in condition proper for shipment by reason of its being too green, that is, too recently manufactured. This contention is based not on any direct evidence

with respect to particular lots of fish meal (with one possible exception) but only on an inference sought to be deduced largely from the consideration that despite the precautions taken for ventilation, meal on all three ships was damaged. The inference is not supported by the testimony. There is no evidence to show that all fish meal of a particular make became damaged in carriage irrespective of where it was stowed; nor is there evidence to show that some lots of fish meal carried undamaged irrespective of place of stowage. The true inference would seem to be that it was the place and conditions of stowage rather than the character of the particular lots of meal that was responsible for the damage. All the fish meal was apparently in good condition when shipped. It had been inspected by the regular Port Inspector. I find no explanation from the evidence of the cause of damage other than inadequate ventilation.

"9. On consideration of these facts and the testimony as a whole, bearing in mind the knowledge in the trade as to the characteristics of fish meal and having in view the long voyage contemplated, the stowage of the meal in the lower holds in such large masses without making adequate provision for ventilation, constituted in my opinion a failure to exercise reasonable skill and care in stowage and management of the cargo which in law constituted negligence on the part of the ships causing the loss."

 A careful study of the record convinces us that these findings are amply supported by the testimony; and the rule is well settled that in such case the findings of the trial court will not be disturbed in the absence of manifest error. The District of Columbia (C.C.A.4th) 74 F. (2d) 977, 103 A.L.R. 768, cert. denied Norfolk & Washington Steamboat Co. v. U. S., 295 U.S. 745, 55 S.Ct. 657, 79 L.Ed. 1691; The Corapeake (C.C.A.4th) 55 F. (2d) 228; Chesapeake Lighterage & Towing Co. v. Baltimore Copper Smelting & Rolling Co. (C.C.A.4th) 40 F.(2d) 394; The Elton (C.C.A.4th) 83 F. 519; Williams S. S. Co. v. Wilbur (C.C.A.9th) 9 F. (2d) 622; The Mazatlan (C.C.A.9th) 287 F. 873; note 103 A.L.R. 791 et seq. And it. is worthy of note, in this connection, that the findings of the trial court are in line with the findings made by Judge Kerrigan and Judge Goddard in somewhat similar cases involving stowage of fish meal. The Willfaro (The Willsolo), 9 F. (2d) 940 (D.C.); The Niel Maersk (D.C.) 18 F.Supp. 824, 1936 A.M.C. 1434. It is true that in the case at bar more care seems to have been exercised to secure ventilation of cargo than appeared in the case of The Willfaro or of The Willsolo and that the stowage in The Niel Maersk was in the shelter decks; but in both cases the crucial fault here found was held determinative, viz., the stowage of a large quantity of fish meal for a long voyage in a closed compartment with inadequate ventilation for cargo of that character. The rule applicable in such cases was well stated by Judge Northcott, speaking for this court, in Bank Line, Ltd. v. Porter (C.C.A.4th) 25 F.(2d) 843, 845, as follows: "The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including * * * such methods as their nature require."

 It is argued that the stowage was in accordance with the custom prevailing at the time and should not be held negligent for that reason; but we agree with the court below that the evidence fails to show any established custom with reference to the stowage of fish meal. In addition to this, it is well settled that custom does not excuse negligence. The Richelieu (C.C.A.4th) 48 F.(2d) 497, 501, 502. The fact that fish meal unless properly stowed with adequate ventilation will generate heat and is subject to spontaneous combustion was well known; and we cannot escape the conclusion that to stow so large a quantity of this commodity closely packed in the holds of the vessels, with no more ventilation than the evidence shows to have been provided, constituted negligence in view of the length of the voyages that were contemplated. Certainly we would not be justified in holding upon the record before us that the conclusion of the trial judge to that effect was clearly wrong.

 It is argued with much earnestness that the fact that some of the bags of fish meal in the holds of the vessels were not damaged, whereas others in the same situation were damaged, shows conclusively that the damage resulted from the inherent quality of the meal contained in the damaged sacks and not from the stowage, and that under the provisions of the bill of lading exempting the carrier from li-

ability for damage resulting from the inherent nature of the goods, there was no liability for such damage. There can be no question, of course, but that the heating occurred because of the inherent quality of the fish meal and not from some external source; and the provisions of the bills of lading would exempt the carrier from liability on that account in the absence of negligence on its part. But the fact that damage to goods arises out of their inherent nature constitutes no defense to the carrier, under such a provision, if it appears that the damage would not have occurred but for the carrier's negligence. Schnell v. The Vallescura, 293 U.S. 296, 305, 55 S.Ct. 194, 79 L.Ed. 373. In other words, if the carrier here had used due care in the stowage of this fish meal, it would not have been liable for damage due to heating which occurred because of the inherent nature of the meal; but where, with knowledge of the propensity of the meal to heat unless properly stowed, it failed to exercise due care in stowage to prevent heating, it is liable for the damage from heating due to such improper stowage. In such case, the negligence of the carrier, without which the heating would not have occurred, is considered the proximate cause of the damage to the cargo.

The fact that, in the case of each of the vessels, part of the cargo stowed in the hold was undamaged, tends to show that the chemical condition of that part was such that lack of proper ventilation did not affect it; but this by no means shows that the damage to the remainder did not result from improper stowage and lack of proper ventilation. As said by the court below (14 F.Supp. 727, 731): "The probable explanation is that the fish meal is not of uniform quality, some containing when shipped much more oil and moisture than others." Because of the nature of the cargo, the carrier was bound to take notice of the need of special care in stowage and of the likelihood that some of it would be in a chemical condition to be injured by heating if adequate ventilation were not provided. That part of the cargo was in such condition as not to be damaged by the negligent stowage was merely a fortunate circumstance. As we said in The Richelieu, supra: "Negligent methods of operation do not always or even generally result in disaster. The inquiry is, not whether a method of operation has

been used without disastrous results, but whether it is of such a character that danger of injury is reasonably to be apprehended from its use. Where the element of danger is present, successful operation is to be deemed 'fortunate rather than prudent.'"

On the second question, the right of Wellman to maintain the suits and of the Standard to intervene, it appears that Wellman, the libelant, was a broker; that he purchased the fish meal and imported it; that the shipments were made for his account and risk upon the letter of credit which he had procured; that he paid the drafts which were drawn against the shipments and was paid in turn by the Standard, having purchased the meal for sale to that corporation; that delivery was made to the corporation; that libel was filed by Wellman in behalf of all persons interested in the shipments; and that, at the trial, the libels were amended to bring in the corporation as a party. We have no doubt that, under these circumstances, the libels can be sustained. Wellman not only was the purchaser of the fish meal and the person to whom it was shipped, but he was also the assignee of the bills of lading attached to the drafts drawn against the shipments. The right of the consignee of a shipment to sue for damages, either in his own name or in the name of his principal, is well settled. 58 C.J. 468; McKinlay v. Morrish, 21 How. 343, 355, 16 L.Ed. 100. And it is equally well settled that the indorsee of a bill of lading may sue for loss of or damage to the goods, though he may be but an agent or trustee for others. 58 C.J. 468; The Thames, 14 Wall. 98, 108, 20 L.Ed. 804; Aunt Jemima Mills Co. v. Lloyd Royal Belge (C.C.A.2d) 34 F.(2d) 120. The Standard, because it had guaranteed Wellman's compliance with his contract that he might obtain the letter of credit, was under the necessity of paying him for the shipments so that he might meet the drafts which had been drawn against them; but while this undoubtedly gave the Standard an equitable interest in any recovery which he might obtain for damages sustained by the shipments, it did not destroy his right as assignee of the bills of lading to file suits for damages to the shipments for the benefit of himself and other persons interested therein. The equities between the holder of the bill of lading and such persons are not matters which a carrier

guilty of negligence can urge in his defense. In The Propeller Monticello v. Mollison, 17 How. 152, 155, 15 L.Ed. 68, in which it was held that receipt of insurance by a libelant furnished no good ground of defense to one liable for collision, the Supreme Court laid down the rule which we think applicable here, as follows: "The respondent is not presumed to know, or bound to inquire, as to the relative equities of parties claiming the damages. He is bound to make satisfaction for the injury he has done. When he has once made it to the injured party, he cannot be made liable to another suit, at the instance of any merely equitable claimant. If notified of such a claim before payment, he may compel the claimants to interplead; otherwise, in making reparation for a wrong done, he need look no further than to the party injured. If others claim a right to stand in his place, they must intervene in proper time, or lose their recourse to the respondent. The insurer may at all times intervene in courts of admiralty, if he has the equitable right to the whole or any part of the damages. Under the 34th rule in admiralty of this court, he may be allowed to intervene, and become the dominus litis, where he can show an abandonment, which divests the original claimant of all interest. See 1 Curtis, 340. Under the 43d rule also he may intervene after decree, and claim the damages recovered, by showing that he is equitably entitled to them. *But with all this the respondent has no concern, nor can he defend himself by setting up these equities of others, unless he can show that he has made satisfaction to the party justly entitled to receive the damages.*" (Italics ours.)

In The Fort Gaines (D.C.) 24 F.(2d) 849, 850, the point was made that suit could not be maintained by a cargo owner for damages when he had been compensated for the loss by insurance. The court said: "It is admitted that the company which insured the cargo is the real party in interest, and it is well recognized that in such case suit may properly be brought in the name of the cargo owner for the benefit of the insurer, who is subrogated to the cargo owner's rights. Eastfield S. S. Co. v. McKeon (D.C.) 186 F. 357; Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522." In affirming the decision on appeal in Federal Forwarding

Co. v. Lanasa, 32 F.(2d) 154, 157, this court said: "The point is made by respondent that libelant has no interest in the case, because he has been paid by the insurers of the cargo for the loss which he sustained, and that therefore the libel should be dismissed. Apart from the fact that the underwriters have been made parties to the suit, the point is without merit; for the equities existing between libelant and the underwriters are no concern of respondent."

See, also, The Tillie, Fed.Cas. No. 14,-049; Pennsylvania R. Co. v. Naam Looze Vennoot Schap (C.C.A.4th) 261 F. 269; Susquehanna Steamship Co. v. A. O. Anderson & Co. (C.C.A.4th) 6 F.(2d) 858; The Speybank (D.C.) 28 F.(2d) 436; National Interocean Co. v. Emmons Coal Mining Corp. (D.C.) 270 F. 997, 999, 1001. In the case last cited, Judge Dickinson said: "The final test, of course, is in whom was the right of property or right of possession where the cause of action concerns property. The judgment must be rendered in favor of the one who has this right of action, and can only be so rendered when he is a party to the proceedings; but he is in admiralty deemed to be a party to the proceedings, if they be brought by some one who is asserting such right of action on his behalf, whether the assertion be as agent or not."

The unnecessary length of the record in these cases leads us to call attention to subsection 6(a) of rule 14 of this court, which requires that in admiralty cases counsel shall, by stipulation, eliminate from the testimony included in the transcript of record all testimony not relevant and material to the questions presented, together with all other irrelevant and immaterial matter. Our rules have been amended so as not to require in admiralty cases the condensation and narrative required of records in other cases; but we must insist that counsel comply with the rule requiring the elimination of immaterial matter. There is no excuse for including in the record on appeal repetition of testimony, as to matters not disputed, or testimony as to matters not relevant to the questions raised by the appeal, or lengthy colloquies between counsel, or colloquies between counsel and the court not necessary to an understanding of the testimony or rulings. Counsel can lighten the court's labors as well as save expense to parties litigant by complying with the rule; and we give no-

tice that hereafter, when it is not complied with, we shall either dismiss the appeal or remand the cause for proper preparation of the record at the cost of parties or counsel, as justice may require.

For the reasons stated, the decrees appealed from will be affirmed.

Affirmed.